FOSTER v. YPSILANTI SAVINGS BANK.

1. Banks and Banking—Liquidation—Administration of Trust
Fund of Questionable Assets.

Under depositors' agreement, signed by owners of 95 per cent.
or more of deposit liability, whereby closed bank was to be
reorganized by having 75 per cent. of deposits returned to de-
positors in the course of a five-year period and balance to con-
stitute a trust fund ''for the purpose of liquidating any assets
which may be considered questionable at this time by the State
banking commissioner * * * with the understanding that if
any of the good assets of said (reorganized) bank should be-
come otherwise that any cash received for any part of the
assets which are in the 25 per cent. classification may be ex-
changed for questionable assets which may be placed in the 75
per cent. classification,'' holders of certificates of participation
in the 25 per cent. trust fund failed to establish maladminis-
.tration of the trust after expiration of five-year period by
showing that upon transfer of cash from trust fund to bank
a questionable or worthless item was actually transferred to
the trust fund.

2. Same—Liquidation—Accounts Receivable.

Term ''accounts receivable,'' as used in depositors' agreement
executed in order to enable bank to reorganize, which were to
be charged off and not included as assets of the reorganized
bank but, since they were of value, transferred to a trust fund
for liquidation without too great a sacrifice, is construed as in-
cluding all assets of the bank in the nature of choses in
action.

3. Contracts—Construction—Intent—Equity.

In the construction of a written instrument, equity always
attempts to get at its substance, and to ascertain, uphold, and
enforce the rights and duties that spring from the real in-
tention of the parties and, while it will not change the words
of the instrument, it will look into all the circumstances under
which it was made in order to determine the proper meaning
of the transaction either to sustain a just claim or to defeat
an unlawful demand.

4. Trusts—Construction of Depositors' Agreement.

The intent of the parties at the time a trust agreement was
made, as gathered from the entire instrument, controls,

Interpretation of contracts, see 1 Restatement, Contracts, §§ 230–
236.

Trustee's duty to exercise reasonable care and skill, see 1 Restate-
ment, Trusts, § 174.

Trustee's duty to enforce claims, see 1 Restatement, Trusts, § 177.

despite literal terms in derogation of the interior sense of the transaction.

5. BANKS AND BANKING—ADMINISTRATION OF LIQUIDATING TRUST— LOAN BY PRESIDENT TO REORGANIZED BANK.

Maladministration of trust containing questionable assets of bank which reopened after setting up of trust pursuant to depositors' agreement to set aside 25 per cent. of their deposits for such trust was not established by fact that president of the bank, in order to enable bank subsequently to qualify for Federal deposit insurance, agreed to hold in abeyance the payment of $8,000 of his certificates of deposit until all other deposits were paid in full, and payment of such amount was effected pursuant to approval of State banking department as funds accrued from earnings and liquidation of the trust assets, the entire transaction being proper, if not absolutely necessary, to perpetuate the reorganized bank as a going solvent financial institution.

6. SAME—LIQUIDATION OF QUESTIONABLE ASSETS—ADMINISTRATION OF TRUST—PROFITS.

In suit against reorganized bank for accounting as to trust fund set up pursuant to depositors' agreement that 25 per cent. of their claims should constitute fund for liquidation of questionable assets, where supervising banking authorities required bank to adjust assets it held to market value at time of termination of trust, transfer to bank of $74,000 from trust funds *held,* proper where $53,000 represented profits previously transferred by bank to trust fund, such transactions being in full accord with the fundamental purpose of the depositors' agreement.

7. SAME—TRUST TO LIQUIDATE QUESTIONABLE ASSETS—ACCOUNTING —GOOD FAITH.

In suit against reorganized bank for accounting of trust fund, established pursuant to depositors' agreement to relegate 25 per cent. of their claims to trust fund for five-year liquidation of questionable assets, transactions with respect to trust assets whereby trust was charged with losses the reorganized bank sustained because of loss of reserve assets due to failure of depository which had been designated by State banking authorities, compromise of obligations of uncollectible obligors, and losses sustained as to some items coming into existence after reorganization *held,* within the contemplated use of the trust by the reorganized bank and proper, in absence of showing of dishonesty or bad faith.

8. Trusts—Settlement of Claims.

A trustee should not be penalized for settling a claim which, in the exercise of good business judgment, he deemed it wise to settle, as the law abhors litigation and trust funds may be conserved by judicious· settlements.

9. Banks and Banking—Trust for Liquidation of Questionable Assets—Uncollectible Debtors.

Under trust for liquidation of questionable assets of closed bank, administered by defendant bank, reorganized upon execution of depositors' agreement relegating 25 per cent. of their claims to such trust which was to be operated for five years and accounts then uncollectible were to be transferred to the bank, where some of bank's debtors were uncollectible for such period, failure of bank to institute suits to secure payment, although some efforts were made at collecting from such debtors, did not damage depositors.

10. Same—Negligence—Outlawed Claims—Surcharge.

In suit against reorganized bank for accounting of trust fund, established pursuant to depositors' agreement to set aside 25 per cent. of their claims for liquidating questionable assets over period of five years, amount due on note for $1,475, indorsed by a collectible indorser, which was lost through oversight of reorganized bank in not pressing matter for payment before being barred by statute of limitations, is not surcharged against trustee which operated the trust, consisting of many items aggregating a large amount, without charge, and there is no claim defendant acted fraudulently or dishonestly (3 Comp. Laws 1929, § 13976).

11. Trusts—Duty of Trustee.

Faithful execution of a trust does not require of the trustee absolute perfection or infallibility but only honesty and a fair degree of skill and industry.

12. Banks and Banking—Liquidation of Questionable Assets—Preferential Payment to City.

Defendant reorganized bank did not fail in its administration of trust established to liquidate questionable assets by failing to recover an alleged preferential payment made to city in which bank was located on last day the old bank had remained open, since had it recovered such payment it would then have had an equally larger deposit liability to satisfy and reorganization was based upon ultimate payment of all depositors in full; such alleged ´preference was no part of the trust with which the reorganized bank was charged, and matter was not called to its attention until after expiration of statute of limitations

had barred possible action against city (3 Comp. Laws 1929, § 13976).

13. SAME—TRUSTS—LIQUIDATION OF QUESTIONABLE ASSETS—DEPOSITORS—ASSESSMENT AGAINST STOCKHOLDERS.

In depositors' suit against reorganized bank for accounting as to trust fund set up pursuant to depositors' agreement whereunder 25 per cent. of their claims were to be relegated to such fund to liquidate questionable assets of the closed bank, complaint as to failure°to collect from bank stockholders who had already paid $75 an additional $25 per share was without merit where agreement left matter of making assessment up to State banking authorities and no such assessment was ordered.

14. SAME—LIQUIDATION OF QUESTIONABLE ASSETS—TRUSTS—AUTOMOBILES—COLLECTIONS.

Charges against trust fund, established pursuant to depositors' agreement to relegate 25 per cent. of their claims to such fund to liquidate questionable assets, for original purchase price of automobile and an agreed amount for two subsequent exchanges were not improper where it was purchased from uncollectible dealer heavily indebted to bank and cars were used in making collections for trust fund and the reorganized bank.

15. SAME—TRUST FOR LIQUIDATING QUESTIONABLE ASSETS—REORGANIZED BANK—TERMINATION.

Under trust fund set up pursuant to depositors' agreement to relegate 25 per cent. of their claims to fund for purpose of liquidating questionable assets and to accept payments on 75 per cent. in stipulated percentages in course of five-year period, where it appears the 75 per cent. was paid in about half the five-year period, such payments would not essentially complete the purpose of the trust where a primary interest of the banking department was to rehabilitate the bank, continue it in a solvent condition for the five-year term, and give the reorganized bank first call upon the assets for such period rather than the depositors.

16. SAME—TRUSTS—CONSTRUCTION OF DEPOSITORS' AGREEMENT—EVIDENCE.

In suit by depositors against bank for accounting of trust fund established in part by depositors under an agreement to enable bank to reorganize, plaintiffs were not prejudiced by trial court by refusing to take testimony as to understanding of certain signers of the agreement relative to their understanding of its meaning and effect.

17. COSTS—ACCOUNTING—TRUSTS.

> In suit for accounting by reorganized bank which administered trust fund that had been established pursuant to depositors' agreement to relegate a portion of their claims to fund for liquidating questionable assets, taxed costs on affirmance of trial court's decree, appealed by holders of certificates of participation, are ordered deducted pro rata from amounts found due respective plaintiffs and interveners under the accounting.

Appeal from Washtenaw; Sample (George W.), J. Submitted June 6, 1941. (Docket No. 4, Calendar No. 41,568.) Decided October 6, 1941.

Bill by Edward D. Foster and others against Ypsilanti Savings Bank for an accounting of trust funds and determination of plaintiffs' interest therein. Bill dismissed. Plaintiffs appeal. Affirmed and remanded.

*Ronald R. Weaver* and *James R. Breakey, Jr.,* for plaintiffs.

*J. Don Lawrence,* for intervening plaintiffs.

*John P. Kirk* (*Burke & Burke,* of counsel), for defendant.

NORTH, J. By action of its board of directors the Ypsilanti Savings Bank, a Michigan banking corporation and defendant herein, suspended business July 24, 1931. About a month later the State banking commissioner filed a bill of complaint looking to the winding up of the bank, and a receiver was appointed. Thereupon interested parties joined in formulating a plan whereby the defendant bank would be reorganized and permitted to resume business. At a meeting of depositors, an agreement providing for reorganization of the bank was consummated and ultimately signed by depositors holding in the aggregate more than 95 per cent. of the deposits. The written depositors' agreement executed

by these parties is printed in full at the foot hereof.*
We have italicized the portions which are more
particularly pertinent to decision herein. We have
also appended hereto a copy of the participation
certificates issued to depositors incident to the exe-

---

* DEPOSITORS' AGREEMENT

Whereas, it is deemed advisable to reorganize the Ypsilanti
Savings Bank, a banking corporation, located in the city of Ypsilanti,
Michigan, with a capital stock of $100,000, and for the purpose of
such reorganization it is necessary that the present stockholders
surrender all of their stock for cancellation and subscribe for new
stock by paying $75 for each share upon the reopening of said bank,
and an additional $25 per share *if and whenever the State banking
commissioner determines that such additional $25 shall be paid,* or
the stockholders shall retain their stock and voluntarily contribute
and pay to said bank at or before it is reopened the sum of $75,000,
and an additional $25,000 if and whenever the State banking com-
missioner shall so determine.

Whereas, I am a depositor in said bank and have moneys on
deposit in said bank at this time, and for value received, and on the
conditions herein set forth, *I, the undersigned, do agree, in order to
enable said Ypsilanti Savings Bank, to reorganize and open its doors
and .to continue as a going banking concern, that 25 per cent. of
the amount of my deposit in said bank be paid into a trust fund, for
the purpose of liquidating any assets which may be considered ques-
tionable at this time by the State banking commissioner of the State
of Michigan, with the understanding that if any of the good assets of
said bank should become otherwise that any cash received for any
part of the assets which are in the 25 per cent. classification may be
exchanged for questionable assets which may be placed in the 75 per
cent. classification,* and with the further agreement upon my part
that the 75 per cent. which I will have on deposit in said bank, is
to be paid to me as follows: 15 per cent. of said deposit within 1
year after date of reorganization; 15 per cent. of said deposit the
second year after date of reorganization; 20 per cent. of said deposit
the third year after date of reorganization; 25 per cent. of said de-
posit the fourth year after date of reorganization, and the balance of
25 per cent. of said deposit the fifth year of reorganization, and with
the further understanding that the 25 per cent. placed in the trust
fund shall not draw interest, and that the remaining 75 per cent.
shall draw interest at the current rate, according to the rules of said
bank, and all profits from the bank during the period of the mora-
torium shall go into this trust fund.

Said moratorium may, however, be lifted prior to its expiration,
if in the opinion of the depositors' committee and the board of
directors, subject to the approval of the banking department, it is
deemed expedient to do so. I also agree to the release of any moneys
on deposit by any depositor which shall be used for the purpose of
paying on assessment. It is also further agreed that every depositor
shall be entitled to draw not in excess of $10 at the time of the
opening of the bank.

All Christmas funds are to be considered separately and the full
75 per cent. may be paid at the usual time.

cution of the depositors' agreement.† In December, 1931, the reorganized bank was permitted to open for business, and the bank undertook the administration of the so-called 25 per cent. trust which by the depositors' agreement had been created for the benefit of the bank and the holders of participation certificates.

---

A depositors committee of three shall act with the directors to pass on all loans during the existence of this agreement.

I make the foregoing concession to enable the Ypsilanti Savings Bank, as aforesaid, to open its doors and bring about a reorganization, and with the knowledge that anyone depositing moneys in said bank from and after its reorganization, will have the right to withdraw such deposits, subject to the regulations and bylaws of said bank.

*It is the condition of this agreement that all the accounts receivable of the Ypsilanti Savings Bank that shall be charged off and not included as assets of the reorganized bank, such assets being of value, but of a value too uncertain to be taken over, shall be transferred to a trust fund, subject to the approval of the banking department of the State of Michigan, for the use and benefit of such reorganized bank, with the understanding that they are to be liquidated as rapidly as possible, without too great a sacrifice. At the expiration of the said five-year period the so-called trust account, or moratorium accounts, shall be closed and there shall be distributed among the depositors pro rata any funds up to the full amount due depositors of said bank. Any funds or accounts uncollectible at the time of the closing of moratorium accounts shall be transferred to the assets of said bank.*

It is also understood and agreed that this agreement upon my part is void unless signed by 95 per cent. in amount of the deposits and unless said bank is reorganized under the direction of the banking department of the State of Michigan.

Dated this ..................... day of ............, 1931.

..................... (L. S.)

Witness:

.............................

† 
                    TRUST FUND CERTIFICATE
                    Ypsilanti Savings Bank
                    Ypsilanti, Michigan.
                                        No.

                                        Date....................

   This is to certify that ............... has deposited in the trust fund of the Ypsilanti Savings Bank $...... without interest for five years, repayment of the above sum to be made through liquidation of trust assets and earnings of bank in accordance with depositor's agreement signed by the above-mentioned depositor and held in the files of the Ypsilanti Savings Bank.

                                    .........................
                                        Cashier.

In about half the five-year time limit provided in the depositors' agreement the bank paid in full with accrued interest to the depositors the 75 per cent. of deposits covered by the moratorium provision of the agreement; but no payments were made on the certificates of participation which depositors held in lieu of the remaining 25 per cent. of the deposits. After the expiration of the five-year period provided in the depositors' agreement for the execution of the trust and on February 16, 1938, plaintiffs in their own right and in behalf of other holders of certificates of participation filed the bill of complaint herein. In brief, they allege maladministration of the trust by the defendant bank and ask an accounting. The charge of maladministration is denied in defendant's answer wherein defendant asserts that its administration of the trust has been in full conformity with the provisions of the depositors' agreement; and defendant asserts willingness to account to plaintiffs. Such an accounting was made in the trial court. Plaintiffs excepted to the accounting as to various items. After a full hearing the trial court allowed the accounting tendered by defendant and dismissed plaintiffs' bill of complaint. In the particulars hereinafter noted, plaintiffs have appealed.

In disposing of this litigation it must be borne in mind that primarily the rights of these litigants are controlled by the depositors' agreement. Hence at the outset it is important to determine the purpose and effect of that agreement because in construing the agreement and determining the rights of the respective parties the purpose sought to be accomplished will be controlling if within the provisions of the contract. In effect the depositors by their agreement put 25 per cent. of their respective deposits into a trust fund "for the purpose of liquidating any assets" of the bank which might

be considered questionable; and the beneficial interest of the depositors in the trust was evidenced by participation certificates issued to them. Payment of such certificates was to be made, if at all, "through liquidation of trust assets and earnings of the bank" during the five-year trust period "in accordance with the depositors' agreement."

Clearly the fundamental purpose of the depositors' agreement, read in its entirety, was to accomplish the reorganization of the bank and to continue it as a solvent financial institution. By so doing the depositors were assured of repayment of 75 per cent. of their deposits and accrued interest within five years, thereby minimizing the loss that in all probability they otherwise would have sustained. As noted above, such payment was made by the reorganized bank to the depositors. The terms of the depositors' agreement clearly disclose that the bank, insofar as its needs required, had during the five-year trust period the first claim on the assets or receipts from liquidation of the assets of this so-called 25 per cent. trust. The agreement recites that the depositors entered into it "with the understanding that if any of the good assets of said bank should become otherwise that any cash received for any part of the assets which are in the 25 per cent. classification may be exchanged for questionable assets which may be placed in the 75 per cent. classification," i.e., the assets held by the reorganized bank. And the agreement also provides that the questionable assets of the old bank "shall be transferred to a trust fund   *   *   *   for the use and benefit of such reorganized bank, with the understanding that they are to be liquidated as rapidly as possible, without too great a sacrifice."

In asserting right of recovery plaintiffs stress the claim of maladministration of the trust in consequence of the failure of defendant bank literally to

"exchange" a questionable asset for every asset removed by the bank from the 25 per cent. trust fund.   Plaintiffs would justify such contention by a literal construction of that portion of the depositors' agreement just above quoted wherein it is provided "that any cash received for any part of the assets which are in the 25 per cent. classification may be *exchanged* for questionable assets" held by the reorganized bank.   An illustrative transaction of the character of which plaintiffs complain would be the taking of money for any "exchanged" item by the reorganized bank from the 25 per cent. fund to make good a write-off on some asset held by the bank in accordance with the direction of the State banking commissioner. It is obvious that plaintiffs would have profited in no way by a bookkeeping transaction whereby the written-off portion of such asset held by the bank was transferred to the 25 per cent. trust.   Or if the asset in lieu of which cash was taken from the 25 per cent. fund was an asset which had become wholly worthless, it would have profited plaintiffs nothing to have transferred it to the 25 per cent. trust fund and in that way literally to have "exchanged" the one item for the other. The record shows that in event the reorganized bank received from a questionable asset an amount in excess of that for which it was carried on the bank's books, such excess was credited to the 25 per cent. trust fund.   By so accounting to the trust fund, we think the bank complied with the requirements of the depositors' agreement wherein it was provided the bank "may *exchange* for questionable assets," et cetera.   In our view of the record, plaintiffs have not established a loss to the 25 per cent. trust fund in consequence of which they are entitled to recover by reason of a failure on the part of the bank to exchange or to place in the 25 per cent. trust fund a questionable or worthless item in lieu

of every good asset removed therefrom. Surely the depositors' agreement could not be construed to require the bank to place in the 25 per cent. trust fund an item of equal value every time it removed an asset therefrom, for such a construction would defeat the fundamental purpose of the depositors' agreement. That would not have aided the reorganized bank in establishing or maintaining a solvent condition. We think it is a fair conclusion that except the depositors' agreement were construed as we construe it herein, it would not have met with the approval of the State banking commissioner and reorganization of the bank would not have been accomplished.

We are not in accord with appellants' further attempt at strict construction in that portion of their brief wherein they state: "The depositors' agreement expressly limits the items that may be for the 'use and benefit' of the bank to *accounts receivable;*' " and argue therefrom in effect that since literally the bank had no "accounts receivable," none of its assets were transferred to the trust fund for "the use and benefit of such reorganized bank." Clearly, as used in the depositors' agreement, the expression "accounts receivable" was intended to include all assets of the bank in the nature of choses in action. In *Hess* v. *Haas,* 230 Mich. 646, 652, we quoted approvingly the following from 21 C. J. p. 204:

"In the construction of a written instrument, equity always attempts to get at its substance, and to ascertain, uphold, and enforce the rights and duties that spring from the real intention of the parties. In doing so, while it will of course not change the words of the instrument, the court of equity will look into all the circumstances under which it was made, in order to determine the proper

meaning of the transaction. It will do this not only to sustain a just claim, but to defeat an unlawful demand.''

In *Union Guardian Trust Co.* v. *Building Securities Corp.,* 280 Mich. 144, 156, we said:

''The intent of the parties at the time the agreement was made, as gathered from the entire instrument, controls despite literal terms in derogation of the interior sense of the transaction.''

Maladministration of this trust by the bank is claimed by plaintiffs incident to the following transaction. After reorganization of the bank it became obviously necessary for it to qualify for insurance of its deposits by the Federal Deposit Insurance Corporation. An official check by Federal and State agents of the bank's assets and liabilities (including the assets of the 25 per cent. trust fund) disclosed insufficient assets to the extent of $8,000 to enable the bank to qualify for Federal insurance of its deposits. Mr. John Kirk, president of the bank, held certificates of deposit in the reorganized bank in excess of $8,000. He entered into an agreement that $8,000 of his certificates of deposit should in effect be placed in escrow and their payment subrogated or held in abeyance until all other deposits were paid in full. Thereby the bank qualified for the Federal insurance. Later, and with the approval of the State banking department, as funds accrued from either bank earnings or liquidation of the assets of the 25 per cent. trust fund, $8,000 were taken over by the bank and Mr. Kirk's certificates of deposit restored to him as normal obligations of the bank. As we view this transaction, it was in full accord with the primary purpose of the depositors' agreement in that it was at least proper if not absolutely essential to secure Federal insurance of de-

posits to perpetuate the reorganized bank as a going, solvent financial institution. The legal effect was no different than as though Mr. Kirk had loaned the bank $8,000, with provision for its repayment being contingent on payment of all other deposits, and thereby presently qualified the bank for Federal insurance; and later the bank, having improved its financial structure and thereby being qualified for Federal insurance of its deposits, had repaid the loan. Of such a transaction clearly plaintiffs have no cause to complain.

Appellants assert failure by defendant properly to execute the trust incident to charging against the 25 per cent. trust fund loss or depreciation on certain bonds and real-estate items held among the assets of the reorganized bank. These transactions are "write-downs or charge-offs" on such bond or real-estate items and were required by supervising banking authorities. We quote from the unchallenged testimony of Max E. Williams, cashier of the bank:

"Prior to the termination of the trust, it was required by supervising authorities that all bonds held by the bank prior to its closing should be adjusted to market value at the time of the termination, in order that the bank should obtain no profit and suffer no loss through the taking over of these assets. It also was recognized that some assets of the bank were in the bank at more than their actual value. In order that there might be no impairment of capital at the time of the trust termination and in order that the new deposits be fully protected, certain adjustments were made on that date."

In the manner and for the reason above indicated, the bank took approximately $74,000 from the 25 per cent. trust fund; but of this amount approximately $53,000 was from "profits transferred from

the bank to the trust." As to this phase of the bank's execution of the trust, appellants' complaint is that in lieu of the cash withdrawn from the 25 per cent. trust fund, "there were no assets at all put in the accounting for that," at least nothing of value. None were set up in the accounting made by defendant. We are of the opinion that appellants' complaint in this particular is without merit because, as above indicated, the challenged transactions were in full accord with the fundamental purpose of the depositors' agreement as therein expressed.

Appellants also complain of a partial loss on a $50,000 deposit as part of its legal reserve by the reorganized bank with a Detroit bank which later failed, but which had been designated as a proper depository by the State banking department; and also of losses resulting from compromise settlements with the makers of various notes held by the bank at less than 100 per cent. of the respective obligations, this being done because of uncollectibility of the obligors. There is also complaint that certain assets placed in the 25 per cent. trust were thereafter taken over by the reorganized bank, and still later returned to and charged by the bank against the trust. All transactions of this character had to do with the administration of the reorganized bank's affairs during the five-year trust period. There is no showing of dishonesty or bad faith in the management of the bank's business. As previously stated, the fundamental purpose of the trust created by the depositors' agreement as recited therein was "to enable said Ypsilanti Savings Bank to reorganize and open its doors and to continue as a going banking concern," and further that the created trust was "for the use and benefit of such reorganized bank." In the above transactions trust

funds were legitimately used to restore losses of the bank and to maintain its solvency, and were not in violation of the terms of the depositors' agreement. In so concluding we are mindful that some of these items came into existence after reorganization of the bank, and hence were not among the assets as originally classified. Nonetheless they were within the provisions of the depositors' agreement which contemplated a right by the bank to use the assets held in the 25 per cent. trust during all of the five-year trust period. In *Mann* v. *Day,* 199 Mich. 88, 96, 97, we said:

"Nor should we penalize the trustee for settling a claim which, in the exercise of good judgment, he deemed it wise to settle. The law abhors litigation, and trust funds, as well as personal funds, may many times be conserved by judicious settlements, rather than protracted and expensive litigation."

Quite in the same phase of this controversy, appellants charge that defendant negligently allowed collection of certain obligations to become barred by the statute of limitations without instituting proceedings to enforce or protect the rights of the bank or of plaintiffs as participants in the 25 per cent. trust fund. Except for an instance about to be noted, we think the record justifies the conclusion that any attempt to collect within the five-year period as against such debtors would have been futile. At least as to some of such obligations the record discloses efforts to secure payment, but suits for collection were not instituted. If these obligations could not have been liquidated within the five-year trust period, plaintiffs have not been damaged, because the depositors' agreement provides that, at the expiration of the trust, accounts uncollectible "shall be transferred to the assets of said bank."

The one item which might have been collected was a note for $1,475. Primarily this was the obligation of Tot Industries; but it bore the indorsement of the G. L. Ennen Company, Inc. The record fairly discloses that this indorser was collectible. Notwithstanding this, suit was not instituted on the obligation prior to its becoming barred by the statute of limitations.* In their brief appellants assert: "This item represents a breach of an elementary duty of a trustee." The explanation made by defendant's cashier was lack of information as to the indorser and that failure to collect "was more or less an oversight." We think the trial judge was correct in taking the larger view of defendant's execution of this trust as a whole rather than in penalizing defendant because of some inadvertent action or inaction which may have resulted to the damage of plaintiffs. In this connection it should be borne in mind that defendant has rendered its services in the execution of this trust without any charge against plaintiffs as the holder of the beneficial interests in the 25 per cent. trust fund. As before noted, there is no claim that in the administration of the trust defendant has acted fraudulently or dishonestly. The particular item just above noted was but one of a very large number aggregating a large amount which entered into the execution of the trust and the simultaneous conduct of the reorganized bank's affairs which in turn was reflected in the 25 per cent. trust fund; and further it should be noted that the execution of the trust extended over a long period of time. Under the circumstances we think the conclusion of the trial judge was equitable in refusing to surcharge the loss resulting incident to this single item against defendant. Faith-

* See 3 Comp. Laws 1929, § 13976 (Stat. Ann. § 27.605).—REPORTER.

ful execution of a trust does not require of the trustee absolute perfection or infallibility. Instead there is required of the trustee only honesty and a fair degree of skill and industry. *Chandler* v. *Preston*, 207 Mich. 244, 262.

A further objection urged by plaintiff against the account filed by defendant arises from an alleged unlawful preference to the city of Ypsilanti by its being allowed, during the afternoon of the last day on which the bank was open prior to its reorganization, to withdraw from the bank cash and bank securities sufficient to cover the city's deposit of upwards of $80,000. Appellants' brief states:

"It is the position of plaintiffs that the transfer of said securities to the city under the circumstances amounts to an unlawful preference and that the bank as trustee of the trust fund should have required that the reopened bank recall and recover all assets from the city of Ypsilanti so that the same might be placed or held in the 75 per cent. classification or the 25 per cent. classification, or both, as the case might be, which would have resulted in a benefit to the trust fund for the plaintiffs, as a class."

Disposition of this phase of the appeal might well be made by merely noting that the transaction involved was no part of the trust with which defendant was charged, nor was this claim mentioned in plaintiffs' bill of complaint or so far as the record shows in any way called to the attention of the defendant until after the statute of limitations had barred possible action against the city. But aside from these phases of the record, we fail, for the reason about to be noted, to understand how, under the circumstances of this case, plaintiffs sustained a loss or damage by the alleged preference, even if it be conceded to have been such.

If the Ypsilanti Savings Bank had been wound up as an insolvent institution, obviously participating creditors would have been damaged by the asserted preference. But the instant case is not of that character. Instead the bank was reorganized on the basis of paying all of its obligations in full, except that portion of its deposits for which plaintiffs took participating certificates. Under this plan either the bank had to pay in full the city's deposits or the plan of reorganization would have been wholly disrupted. Under the circumstances nothing would have been accomplished if defendant had recovered the alleged preferential payment, because that would have revived the obligation to pay the original deposit. Defendant would simply have recovered an asset and at the same time brought to itself and been compelled to satisfy a liability of equal amount. Any other disposition of the bank's obligation to the city for its deposit would have been wholly incompatible with the adopted plan for the reorganization of the bank. Defendant did not fail in the discharge of its trust by not recovering from the city the alleged preferential payment of its deposit.

We note only two other of plaintiffs' objections to defendant's accounting made in the trial court. There is no merit to the first of these two charges stated in appellants' brief as follows:

"Plaintiffs contend that it was the unquestioned duty of the defendant, as trustee, to cause the assessment of $25,000 to be levied against the stockholders when it became apparent that the trust-certificate holders would not be paid in full. Plaintiffs further claim that the failure of the bank, as trustee, to obtain this asset for the trust-certificate holders was negligence and that the use of its influence

and its request to the banking department not to determine that the assessment should be levied was exactly contrary to its duty as trustee and amounts to malfeasance.   *   *   *

"It was admitted that Mr. Kirk [president and director], Mr. Ferguson [a director], and Mr. Williams [cashier] were called to the banking department with reference to the assessment and that it was discussed but the officials of the bank did not think an assessment was justified, in fact it was stated they did not see why they should even recommend that an assessment be levied and that they were opposed to it."

From the above quotation and the record it appears that the matter of a further stockholders' assessment was taken up before the State banking department on the demand or request of plaintiffs' attorney, Mr. Breakey. A further assessment was not ordered or sought to be made by the banking commissioner. The power to determine whether a further stockholders' assessment should be required was primarily vested in the State banking commissioner. The depositors' agreement upon which plaintiffs base their case provides that the bank should be "reorganized under the direction of the banking department of the State of Michigan," and as to further payments by or assessments upon the stockholders it provides: "and an additional $25 per share if and whenever the State banking commissioner determines that such additional $25 shall be paid." The record does not show that any fraud or deceit was practiced by the bank or its representatives on the State banking department when it considered the question of ordering an additional stockholders' assessment. Obviously decision not to order such assessment was the decision of the State banking department; and the defendant bank

is not chargeable with the consequences of the action or inaction of that department.

The remaining item of the accounting discussed in appellants' brief, and to which they object, is the bank's purchase of an automobile and subsequent trades for later models. These transactions were with an automobile dealer who was heavily indebted to the bank; and this indebtedness was placed among the questionable assets in the 25 per cent. trust. The original purchase price was credited to the dealer's account, and likewise the amount agreed upon incident to each of the two subsequent exchanges for a later model was credited against the dealer's indebtedness to the bank. Plaintiffs assert that these transactions as shown in defendant's accounts depleted the 25 per cent. trust fund in the amount of $1,295.54. The record shows that the account against which the transactions were credited was uncollectible; and further that the automobiles "were used by our [the bank's] officers and employees in making collections on these assets. * * * Whenever we had to make any calls in making collections, we used the car that we obtained in that way. * * * It is still being used for the purpose of collecting trust assets as well as bank assets whenever it is necessary to use the car to go any place for that purpose. * * * The three automobiles that were purchased from the Wiedman Company were used only in connection with the bank during this five-year period. They were used by whoever was out trying to make collections on these assets that we held in the bank and in the trust." We think plaintiffs have no cause of complaint as to these transactions since the purchase of an automobile was, like the trust fund as a whole, "for the use and benefit" of the reorganized bank, and there

is no showing that the expenditure was not reasonably necessary and proper. It would be highly inequitable to hold the bank liable for the $1,295.54 credited by it to the automobile dealer's uncollectible account.

In that portion of the decree which pertains to the factual aspects of this case, the circuit judge said:

"I cannot find any place in the testimony where there was any dishonesty of any kind upon the part of any of the directors of the bank, and they used their best efforts in obtaining for the depositors just as much money as they possibly could, and gave of their time and effort without what this court deems any compensation whatever. The stockholders agreed in their depositors' agreement they would give up all payment of any profits during the five-year period. If profits were made they would be placed in the trust fund. No profits have been made to the stockholders up to this time."

We do not agree with the statement in appellants' reply brief that:

"The trust had essentially completed its objective and purpose when the depositors received in full the balance of their 75 per cent. at which time the trust fund consisted of a substantial amount of assets. * * * no satisfactory reason can be suggested why the trust might [not] very well have terminated at that time, at which time it was of substantial value."

It seems too clear for argument that under the terms of the depositors' agreement it cannot be said, as appellants contend in the above quotation, that the whole purpose of the trust had been essentially accomplished when the 75 per cent. moratorium payments had been made to depositors. So to hold is to overlook entirely what must have been the primary

interest of the State banking department in rehabilitating the bank and continuing it in a solvent condition during the whole of the five-year term, and in effect giving the reorganized bank the first call upon all assets insofar as necessary to accomplish that purpose.

Nor are we in accord with appellants' contention that the trial court prevented them from fully and fairly presenting their case by refusing to take testimony as to the understanding of certain signers of the depositors' agreement relative to the effect and meaning of that agreement. Granted that some of those who signed the depositors' agreement might not have fully understood its purport, still in our view the record is so full and conclusive on that phase of the case that no prejudicial error was committed by the trial judge's limitation of the testimony.

Careful consideration of the record on this appeal satisfies us that the trial judge was correct in decreeing the allowance of the accounting made by defendant, and in that particular the decree is affirmed. But the record discloses that at the time it rendered its account of the trust, defendant had in its possession $12,282.63 for distribution among holders of certificates of participation. The case should be remanded for further procedure looking to the payment of the amounts due under the accounting to plaintiffs, provided that taxed costs of this appeal may be deducted *pro rata* from the amounts determined to be due to the respective plaintiffs and interveners. It is so ordered.

Sharpe, C. J., and Bushnell, Boyles, Chandler, Starr, Wiest, and Butzel, JJ., concurred.